WESTCHESTER COUNTY.—HON. OWEN T. COFFIN, SURROGATE.—January, 1889.

MATTER OF COCKS.

*In the matter of the judicial settlement of the account of* PHEBE C. HAVILAND *and others, as executors of the will of* JOHN COCKS, *deceased.*

The executrix of an estate received no portion of the property into her hands as executrix, and the estate was managed by the other executors, reputed to be men of wealth and integrity. Under the will of decedent the executors were directed to invest a certain share of the estate on bond and mortgage in Westchester county. Certain executors, and not the executrix, received the amount of the legacy to so invest, but did not do so, and put the money into their business. Of

this fact the executrix had no knowledge, and upon inquiry she was assured by one or both of the executors that the share had been invested as directed by the will. She knew that another share had been invested by the executors in a manner different from that directed by the will. Thereafter the executors, who were supposed to be men of large means, and transacting a lucrative and safe business, failed, and money constituting the share already referred to and put into their business, was lost by their failure. *Held*, that the executrix was not liable for the loss of this share.

ACCOUNTING of executors.

John Cocks, the testator, died in 1868, leaving a will, which was admitted to probate the same year. He left five children, all of whom he made executors, together with his widow, Adelia Cocks, and the husbands of such of his daughters as were then married. By the will, among other things, he directed his executors to invest on bond and mortgage, a fund sufficient to yield an annual income of $1,000, which he gave to his widow in lieu of dower. The residue of his estate, amounting to over $100,000, he directed to be divided equally among his children, except that the executors were directed to hold his son David's share, in trust, for the benefit of David for life, with remainder to his children; which share was also to be invested on bonds and mortgages in Westchester county. All of the executors qualified. An inventory was made and returned, signed by Harrison Cocks, one of the executors alone. George J. Barlow, with his wife Mary, and Harrison Cocks, three of the executors, all resided at Croton Landing, which was the residence of the testator, and George J. Barlow and Harrison Cocks were brick manufacturers under the firm name of Cocks & Barlow. Mrs. Phebe C. Haviland and Daniel E. Haviland, two of the exec-

utors, resided in Sing Sing, four miles from Croton Landing. The assets of the estate came at once into the hands and possession of Cocks and Barlow, who were reputed to be men of considerable means and to be doing an extensive and prosperous business. Excepting the portion which was to produce the widow's annuity, the assets of the estate, including proceeds of real estate sold, which were all in the possession of Cocks & Barlow, were divided among the children, David Cocks being present. He at once placed the one fifth, of which he was given the use, in the hands of George J. Barlow. None of the other executors ever received, as such, any of the assets until long subsequent to the loss which gives rise to the present controversy; nor did they, in any manner, take part in the administration, except to make inquiries or to raise objections. Contrary to the provisions of the will, ten thousand dollars were invested by Cocks & Barlow on bond and mortgage on lands in a western state, at ten per cent interest, to secure the annuity of the widow. Harrison Cocks consulted Mrs. Haviland about it, when she declined to assent until she could confer with her husband. After she had done so, she informed Harrison that he thought it ought not to be done, when he replied that it had been done already. The widow, who was the second wife of the deceased, and the stepmother of his children, was not held in much respect by them, and was not paid her annuity regularly. She commenced proceedings in 1871 or 1872 to compel payments of arrears thereof. Thereupon the executors Harrison Cocks, Anna Cocks (now Varney), Phebe C. Haviland, George J. Barlow

and Mary Barlow executed a bond obligating them-
selves to pay the same.   It was recited in the bond
that they, for the most part, had charge and control
of the estate, and had not yet made any investment
upon bond and mortgage on real property in West-
chester county to secure the annuity.   The widow is
still living.   Mrs. Haviland occasionally made inquiry
as to whether the share of David was invested as
directed by the will, and was assured by Cocks & Bar-
low, or one of them, that it was.   Cocks & Barlow
unexpectedly became insolvent in 1876, when Mrs.
Haviland at once took steps to recover as much of
the estate as was possible, and succeeded in a small
degree.   It was then ascertained that David's share
had not been invested as represented, but had been
chiefly, in effect, used in the business of Cocks & Bar-
low and lost.   In 1881 there was an accounting by
the executors, including David Cocks, in which he
made no claim for arrears of income on his share.   He
died in September following, leaving him surviving
his children, George Cocks, Charles Cocks, William
Cocks, Nathan Cocks, Eugene Cocks, Armenia Cocks,
Matilda Cocks, Anna Cocks, and Virginia Cocks.   In
1887, the widow of testator cited the surviving exec-
utors to show cause why they should not render an
account.   Thereupon the executrix, Phebe C. Havi-
land, filed a petition for the judicial settlement of her
accounts, and caused to be cited her co-executors and
the above named children of David Cocks, none of
whom appeared except said widow and the special
guardian of the two last named children of David,
who were minors.   Mrs. Haviland rendered her ac-

count, which was not objected to, and the controversy related merely to the proper disposal of the fund in her hands, amounting to about $7,000, although the special guardian claimed that the executors were liable for the share of which David had the use, and it was stated in the opinion (6 Dem., 4) that the court had not sufficient facts before it to enable it to determine that question, and that it desired, and the case would be held open for the reception of evidence on that subject. None was offered, and a decree was entered, simply determining the rights of the widow in the fund, and concluding with these words : "That same is without prejudice to any remedies which David Cocks' children may have against any of the executors and which are not determined by this decree." This seemed to leave the matter open in regard to their claim, and they, in 1888, filed a petition and cited Mrs. Haviland and the other surviving executors to show cause why they should not account to pay to them their father's share of the estate. Prior to this George J. Barlow had died, and his wife and Harrison Cocks were regarded as insolvent.

THOMAS NELSON, *for* PHEBE C. HAVILAND, *executrix.*

WILLIAM THORP, *for petitioners*, ARMENIA COCKS *and others.*

WILLIAM H. GALE, *general guardian for minors.*

J. A. HUDSON, *for the widow*, ADELIA COCKS.

SAMUEL WATSON, *for* HARRISON COCKS, *executor.*

THE SURROGATE.—The affairs of this estate and its management, in different forms, have been frequently the subjects of consideration by this court. Without pausing to determine whether this may be

regarded as a continuation of the accounting proceeding had in 1887, or whether the statute of limitations is a bar to the claim of the adult children of David Cocks, deceased, as is urged by the counsel for Mr. and Mrs. Haviland, it is deemed best to treat of the matter upon its merits, as presented, especially as the statute of limitations cannot be successfully interposed as against the claims of the minors, or of those who became of age within one year prior to the commencement of this proceeding.

The proceeding is instituted solely with a view to the recovery of the share of the estate of which David Cocks had the use for life ; and that share having been lost by the executors who had charge of it, the question is whether Mrs. Haviland, having had nothing to do with it personally, is liable, under the facts disclosed, for that loss. It does not appear that she had any of that share, or any portion of the estate, in her hands as executrix. She simply received from Cocks & Barlow her distributive share, as legatee. They were considered, by all concerned, to be men of large means and transacting a lucrative and safe business. It is true, that as early as 1872, she knew that they had invested the $10,000 in Wisconsin, to secure the annuity to the widow, but it was done without her consent, and while Cocks & Barlow were regarded as amply able to meet any contingencies springing from their disregard of the provisions of the will, in respect to the mode of investment. Of course, if no loss had occurred ultimately, no one would have had any ground of complaint. She, with the other executors, exclusive of her husband, executed a bond to the

widow, conditioned for the payment of her annuity. The evidence is conflicting as to whether she, at the time, knew the contents of the bond. It does not strike me as at all important whether she did or not. This case has nothing to do with that fund. The bond contained certain recitals of fact which may be regarded as established without it. Among other things, it recites that, " the undersigned for the most part, have charge and control of the estate," and was executed by five persons, among whom were Harrison. Cocks, George J. Barlow, and Mary Barlow, who were " the most part," and who had the actual custody of the assets. This was a well-known and undisputed fact. Then, it proceeds to recite that the investment had not been made on bonds and mortgages in Westchester county. This was also proven without the recital in the bond. It is not easy to discover how her willingness to become personally bound for the payment of the widow's annuity, when she had abundant confidence in the pecuniary ability of Cocks & Barlow to meet all demands which might be made upon them, can affect the question of her liability for the share in controversy, which she understood to be properly invested. It is no evidence that she had any knowledge of, aided or concurred in, the management which led to the loss. Aside from these considerations the recitals do not seem to be competent as evidence against her, in this case.

The respective learned counsel have referred me to cases of recent decision in the Court of Appeals, on some of which both rely as sustaining their several views as to the liability or non-liability of the exec-

utrix, Mrs. Haviland. They have been carefully considered with regard to the facts and the legal deductions therefrom.

In the case of Adair v. Brimmer, 74 *N. Y.* 561, the executors had an agent to take charge of the assets, and he, with the knowledge of the executors, made advances to Charles, who was also an executor, of a sum considerably in excess of his share of the estate, when the executor, Brimmer, who had a knowledge of the acts of the agent, thinking that the advances made to him already equaled his share, when they were, in fact, in excess, forbade the agent to advance him any more. The amount so paid in excess was lost; held, that the other executors were liable.

In Ormiston v. Olcott, 84 *N. Y.* 339, one of the three executors and trustees had received all the assets and proceeds of the estate, and had the entire charge of the same. After his death it was found that much of the assets had been invested and lost, or converted by him and mingled with his own funds; Held, that the executors and trustees were not liable for the *devastavit;* that each executor and trustee is liable only for his own acts, and that one cannot be made responsible for the negligence or waste of another, unless he, in some manner, aided or concurred therein.

Croft v. Williams, 88 *N. Y.* 384, was a case where the facts showed among other things, that on a sale of some real estate, both executors were present when the purchase money was paid and which was taken by one of them, and subsequently wasted. It was held that the executor who was passive, permitting the

other to take the money, was not liable for the *devastavit*. The court says, " One therefore, may sit passive and see the other receive funds of the estate, and, making no objection, be deemed to assent, but that does not make him responsible for what has been received. He must, in some manner, know and assent to the misapplication ; he must be a consenting party to the waste, or neglect some duty consequent upon his knowledge of a misapplication intended or in progress."

The case of Paulding v. Sharkey, *Id.* 432, is to the same effect. There the money on a sale of real estate, was paid in a check payable to the order of one of the three executors, who were all present. He, in good faith, indorsed and delivered the check to a co-executor, who drew the money and wasted it, and it was held that the other executors were not chargeable with the loss.

In Earle v. Earle, 93 *N. Y.* 104, an agent or agents were permitted to act for the executors in investing and re-investing a large fund. The executors, from time to time, executed assignments of mortgages and satisfaction pieces as they were paid in, had knowledge that the agents were investing on second mortgages, without objecting, and by reason of these latter, a large portion of the fund was lost. Under these circumstances, the executors were held liable for the loss.

In the case of Wilmerding v. McKesson, 103 *N. Y.* 329, it was held that the executor, sought to be charged with the amount of the *devastavit*, did not occupy the position of a passive trustee, merely joining in the receipts, etc., for conformity. He advised

as investments, passed his accounts as executor and received his commissions, consulted counsel, united in employing an accountant, etc. He must have known that a large portion of the funds was used in the business of a firm of which his co-executor was a member, and through whose failure the loss occurred, and took no steps to protect the fund from the hazards to which it was thus exposed, or even protested against its employment by the firm. He was held liable, but not for a loss occurring through the abstraction of securities by his co-executor, during the same period, and applying them to his own use.

None of these cases seem to reach so far as to fix a liability for the loss of David's share upon this executrix. She was present and saw the funds, representing that share, pass into the hands of George J. Barlow, but that fact does not make her responsible for it. There is no evidence to show that she knew of, or assented to, the use of it by Cocks & Barlow, either in their business or otherwise. On the contrary she believed, or was told by Barlow, and had reason to believe that it was properly invested. She cannot, therefore, be charged with knowing and assenting to the misapplication. To hold her liable, in the language of the court in Croft v. Williams, *supra:* "She must be a consenting party to the waste, or neglect some duty consequent upon her knowledge of a misapplication intended or in progress."

There is another matter which has attracted but little attention of, nor been discussed by, counsel. Yet it ought here to be disposed of. The testator has another son, John C. Cocks, who resided and died in

the state of Illinois, intestate, seized, as is alleged, of some real estate near Chicago. His death occurred during the lifetime of his father. It is said that Harrison Cocks, his brother, became administrator of his estate. After the death of the testator, his executors set on foot an investigation in regard to this real estate, and found that the records of the title had been destroyed at the time of the great Chicago fire, and that the land had been sold for taxes. They paid $3,000 to redeem it and commenced proceedings for its recovery, at a cost of $1,000 more. Then a compromise was effected, each of the five children conveying his or her interest to the claimant for the sum of $800. This simply equaled the amount of the expenditure. David thus received his share of the purchase money, as is stated, but Mrs. Haviland refused to join in the conveyance. It is assumed that the laws of Illinois and our own are the same on the subject of descent, and that the testator inherited the real estate and died seized. It was, therefore, a part of his estate, and has not been conveyed by the executors, as such. David has a right to convey his life interest, subject to the exercise of the power by the executors, but he could not convey the remainder. If there is any just claim of his children now, the title is vested in them subject, only, to the exercise of such power. This power the Surrogate's Court cannot compel them to exert. At all events, Mrs. Haviland did not concur in the sale of his interest, nor, in any way, receive any of the proceeds. Should the assumption in regard to the law of descent in Illi-

nois, prove to be erroneous, it is not discovered how it would affect her liability.

It follows from the facts and views expressed, that no responsibility is fixed upon her beyond that which was determined by the decree of November, 1887.

NOTE. He who holds a position of trust jointly with others, cannot remain passive when he knows of the irregular acts of his associates, without incurring responsibility for such acts. Matter of Niles, 113 *N. Y.* 547.